IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:15-cr-227-SI |
| v. | **OPINION AND ORDER** |
| **ANDRE EUGENE SHAW**, | |
| Defendant. | |

Billy J. Williams, United States Attorney, and Gary Y. Sussman, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 S.W. Third Avenue, Suite 600, Portland, Oregon 97204. Of Attorneys for United States of America.

Richard L. McBreen III, OWENS & MCBREEN, P.C., 319 S.W. Washington Street, Suite 614, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

      On December 18, 2014, law enforcement officers searched the home of Defendant Andre Eugene Shaw ("Shaw" or "Defendant"). They seized evidence of, among other things, Shaw's alleged involvement in extortion and creating fake identification documents. Shaw argues that the search of his home took place without probable cause, in violation of his Fourth Amendment rights, and he moves to suppress all evidence obtained from the search. Shaw also moves to controvert the search warrant affidavit and requests a *Franks* hearing to consider whether the

affidavit establishes probable cause in the absence of what he argues are false statements and material omissions. *See Franks v. Delaware*, 438 U.S. 154 (1978). For the following reasons, the Court denies Shaw's motions.

## STANDARDS

The Warrant Clause of the Fourth Amendment requires that "[t]he right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation . . . ." U.S. Const. amend. IV. "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *United States v. Garcia-Villalba*, 585 F.3d 1223, 1233 (9th Cir. 2009) (quoting *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006)). To find that probable cause supports a search warrant, an issuing judge must find that "given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The "affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination." *Id.* After a magistrate judge determines that probable cause exists, that "determination . . . should be paid great deference by reviewing courts." *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011).

When a search has taken place without probable cause, in violation of the Fourth Amendment, the exclusionary rule may require suppression of any evidence obtained in the course of the search. *See Davis v. United States*, 564 U.S. 229, 236 (2011). Suppression is not, however, required by all violations of the Fourth Amendment. Suppression is not appropriate, for example, "when an officer acting with objective good faith has obtained a search warrant from a

judge or magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920 (1984).
The "good faith" exception to the probable cause requirement applies if an officer's reliance on a
search warrant is "objectively reasonable." *Id.* at 922. "Objectively reasonable" means that "a
reasonably well trained officer" would have had no reason to know "that the search was illegal
despite the magistrate's authorization." *Id.* at 922 at n.23. The good faith exception to the
probable cause requirement does not apply if, among other things, "the magistrate or judge in
issuing a warrant was misled by information in an affidavit that the affiant knew was false or
would have known was false except for his reckless disregard of the truth." *Id.* at 923.

     To show that suppression of evidence is warranted and that the good faith exception does
not apply, a defendant may challenge the truthfulness of factual statements made in an affidavit
supporting a search warrant. In *Franks v. Delaware*, 438 U.S. 154, the Supreme Court held:

> where the defendant makes a substantial preliminary showing that
> a false statement knowingly and intentionally, or with reckless
> disregard for the truth, was included by the affiant in the warrant
> affidavit, and if the allegedly false statement is necessary to the
> finding of probable cause, the Fourth Amendment requires that a
> hearing be held at the defendant's request.

*Id.* at 155-56. There, however, is "a presumption of validity" for information in an affidavit in
support of a warrant. *Id.* at 171. The defendant's allegations to the contrary must be "more than
conclusory" and "accompanied by an offer of proof," such as "[a]ffidavits or sworn or otherwise
reliable statements of witnesses." *Id.* "Allegations of negligence or innocent mistake" are not
sufficient to sustain a *Franks* motion; the defendant must show "deliberate falsehood or . . .
reckless disregard for the truth." *Id.* This does not mean that a defendant must produce "clear
proof of deliberate or reckless omissions or misrepresentations at the pleading stage." *United
States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005). Rather, the defendant must "make
a substantial showing that supports a finding of intent or recklessness." *Id.*

If after striking the false portions of the affidavit, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 172. Generally, "proof that law enforcement officials either lied or made reckless misstatements in affidavits to secure a warrant or order does not in and of itself invalidate that warrant or order, or compel suppression of evidence obtained upon its execution." *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985). In order to invalidate a warrant or compel suppression of evidence, the "false statements [must be] material in causing the warrant to issue." *Id.*

A *Franks* hearing also is warranted if a "defendant make[s] a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir.) ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning."), *amended by* 769 F.2d 1410 (9th Cir. 1985). As with a falsehood included, omissions of fact must be "material to the finding of probable cause." *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004). Omissions are not material if the affidavit provides "sufficient circumstances to have a substantial basis for finding probable cause." *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir. 1988); *see also United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (explaining that no *Franks* hearing is required "[i]f inclusion of the omitted facts would not have affected the probable cause determination").

The Ninth Circuit has distilled these requirements into the following five-element test:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits,

must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

*United States v. DiCesare*, 765 F.2d 890, 894-95 (9th Cir. 1985), *amended by* 777 F.2d 543 (1985).

## BACKGROUND

### A.  Search of Shaw's Residence

A search warrant for Shaw's home was signed by a magistrate judge on December 17, 2014. The warrant authorized the seizure of multiple items, including among other things: (1) documents relating to the production, transportation, distribution, and possession of child pornography and the selling and buying of children; (2) documents relating to blackmail, interstate communication of threats, receiving proceeds of extortion, and fraud and related activity in connection with computers and identification documents; (3) documents relating to electronic money transfers; (4) computer equipment or digital devices capable of being used to commit the crimes specified; (5) identification cards or software programs for creating identification cards; and (6) printers. The Government executed the warrant on December 18, 2014. Law enforcement officials seized, among other things, multiple firearms, silencers, ammunition, computers and other electronics, false identification cards, and supplies for making false identification cards.[1]

On June 17, 2015, a federal grand jury returned an indictment, charging Defendant with one count of possession of an unregistered firearm, one count of possession of unregistered

---

[1] The computer equipment and digital data storage media were sent to the Northwest Regional Computer Forensics Laboratory (the "NWRCFL") for analysis. All of the equipment was encrypted, and the NWRCFL could not defeat the encryption. The equipment was then sent to a forensic laboratory at the Federal Bureau of Investigation ("FBI") headquarters, but FBI agents there also could not defeat the encryption. The Government represents in its response brief that the contents of the computer equipment and data storage media remain unknown.

silencers, one count of possession with intent to use unlawfully five or more false identification

documents, and one count of possession of a document-making implement or authentication

feature with intent to produce a false identification document. A federal grand jury returned a

superseding indictment on June 15, 2016. The superseding indictment added two counts of

interference with commerce by extortion, two counts of interstate communications with intent to

extort, one count of receiving proceeds of extortion, and one count of money laundering.

## B.  Underlying Search Warrant Affidavit

The search warrant for Shaw's residence was supported by the sworn affidavit of FBI

Special Agent Charles Dodsworth. In his affidavit, Special Agent Dodsworth attested to the

following facts. On July 18, 2014, FBI agents in the District of Oregon arrested a person

identified as S1. S1 admitted to sexually abusing several children, including his own daughter,

producing child pornography, and sharing child pornography over the internet. When

investigators examined S1's computer, they found a significant amount of child pornography and

internet chat logs containing communications between S1 and others who were producing and

distributing child pornography. S1 also told FBI agents that someone who went by the

screenname "Redeemer" had been blackmailing him. S1 said that he had paid Redeemer up to

$1,000 per month for approximately three years.

According to S1, Redeemer hacked into S1's computer, was aware of his child

pornography activities, and threatened to expose him if he did not pay. Redeemer also asked S1

to transmit or forward payments from other blackmail victims. Redeemer sent or caused to be

sent money to S1 via Western Union and Moneygram money transfers, payable to fictitious

payees. Redeemer directed S1 to give the money to a person in Oregon named "Joe." Redeemer

also sent or caused to be sent to S1 between $2,000 and $10,000 per month to give to Joe.

Redeemer also sent various fake identification cards, including driver's licenses and military

contractor identification cards, to Joe to give to S1. S1 used the fake identification cards when picking up the money transfers.

S1 also told FBI agents that approximately two years ago, Redeemer began demanding "local pictures" of S1's prepubescent daughter, referred to as "PD." Redeemer also instructed S1 to deliver PD to Joe on at least two occasions. S1 believed that Joe or others whom Joe knew would sexually abuse PD and take sexually explicit photographs of her. Most recently, Redeemer instructed S1 to buy costumes and provide a camera so that Joe could do a photoshoot with PD. S1 wanted to drug his daughter so that she would not remember her encounters with Joe. A chat log between S1 and Redeemer on July 16, 2014, shows discussions about a "meet" with "j" for which S1 would supply various costumes, including an "animal tail buttplug." ECF 32-1 at 12. In the chat log, S1 writes that his daughter will be "out solid from 9-3" and "that will be more than long enough to get the photo sets." ECF 32-1 at 13. Redeemer also mentions that he has "new ids on the way." *Id.* at 14.

According to S1, on July 17, 2014, S1 delivered to Joe the costumes and camera, along with PD (whom S1 drugged beforehand). Text messages from S1's cellphone show that on that day, S1 talked to Joe about meeting in an empty parking lot and the possibility that Joe might have to carry something, presumably S1's unconscious daughter. Joe returned PD and the items later that day. S1 told FBI agents that items that the FBI found in a box in his garage were the items that S1 gave to Joe for the photoshoot. S1 stated that after Joe returned PD, S1 took her to Walgreens. Surveillance footage from Walgreens on July 17, 2014, shows S1 and his daughter inside the store.

S1 gave FBI agents identification information about the person known as "Joe." Sl described Joe as a light-skinned black male with short hair, about Sl's height or taller, with a

piercing in his right eyebrow, and tattoos of Chinese characters on his neck. S1 stated that Joe sometimes drives a Ducati motorcycle and wears a gray helmet with a pink "Mohawk" ornament on the top. S1 further stated that Joe also drives a silver Toyota Corolla and lives with a woman with kids. S1 had written down the Toyota's license plate number and gave the number to the FBI. S1 also gave FBI agents the cellphone number that S1 had for Joe. According to Sprint Wireless, the subscriber of that number is Joe Stanis, using a post office box in Irvine, California.

FBI agents traced the license plate number supplied by S1 to a silver Toyota Camry registered to Molly Taylor. Ms. Taylor's address was listed as 1411 SE 179th Avenue, Portland, OR 97233. Records showed that a black male, identified as Andre Eugene Shaw, had been arrested while driving the silver Toyota Camry in December 2013. A booking photo showed that Shaw is a light-skinned black man with short hair and what looks like a piercing hole in his right eyebrow.[2] Criminal history records note that Shaw has tattoos on his neck.

Public records listed Shaw's current address as 1411 SE 179th Avenue, in Portland. On approximately November 13, 2014, the FBI placed a pole camera near the residence at 1411 SE 179th Avenue, where the FBI believed Ms. Taylor and Shaw live. On November 26, 2014, an individual driving what appeared to be a Ducati motorcycle and wearing a helmet with a pink or red Mohawk ornament on top pulled out of the driveway of the residence.

S1 also told FBI agents that from 2010 to 2011, S1 sent almost $10,000 in Western Union money transfers to several addresses in Johnstown, New York, and Gloversville, New York. Shaw's criminal history revealed that he had been arrested several times in New York for, among other offenses, forgery and possession of stolen property. Records show that, at various times, Shaw lived both in Johnstown, New York, and in Gloversville, New York. One of the addresses

---

[2] Special Agent Dodsworth learned that the Multnomah County Jail requires inmates to remove all jewelry before booking photos are taken.

to which S1 sent money was 143 Bleecker St, Gloversville, NY. Shaw's criminal history show

that he had lived at 140 Bleecker St, Gloversville, New York.

      An email that Special Agent Dodsworth found through a search of an FBI database

corroborated S1's story. Ms. Barrie Lee Gispert sent the email to the FBI on January 16, 2014. In

the email, Ms. Gispert reported hearing from a third party that Shaw lived at 1411 SE 179th

Street and was making fake identification cards. Ms. Gispert also reported that Shaw hacked into

people's computers to steal bank information. According to Ms. Gispert, Shaw is from New

York and goes by the name "Joe" in Oregon. Ms. Gispert further reported that Shaw lives with

Ms. Taylor and operates his business out of his residence.

      An unrelated incident at 1411 SE 179th Avenue provided further corroboration of S1's

account of events. On December 11, 2014, Gresham Police responded to a report of a shooting at

that address. There, police officers contacted Shaw, who identified himself as Joe Stanis.

Officers were invited into the residence and observed a bank of approximately eight computer

monitors, other computer equipment, a monitor for a video surveillance system, and a bulletproof

vest. In the garage, officers saw a Ducati motorcycle and a black motorcycle helmet with a red or

pink Mohawk ornament on the top. A detective later viewed the booking photo taken after

Shaw's arrest in December 2013, and confirmed that it was the same person who identified

himself to the Gresham Police as Joe Stanis.

      Based on the evidence described above, Special Agent Dodsworth stated that he had

probable cause to believe that Shaw was involved in a conspiracy to produce child pornography,

to obtain a child for the purpose of producing child pornography, to commit blackmail and

extortion, and to produce or disseminate false identification cards. Accordingly, the Government

prepared an application for a search warrant, seeking permission to search for and seize evidence

of these crimes, including how computers, digital devices, and digital storage media were used, the purpose of their use, and who used them. On December 17, 2014, U.S. Magistrate Judge John V. Acosta issued a warrant authorizing searches of Shaw and his residence and seizure of the desired evidence.

## C.  Special Agent Dodsworth's Declaration

On July 18, 2016, Special Agent Dodsworth submitted a declaration in support of the Government's opposition to Shaw's motions. In his declaration, Special Agent Dodsworth states that S1 has pled guilty to a single count of production of child pornography. To Special Agent Dodsworth's knowledge, the FBI has not made any promises to S1 and has not offered him immunity.[3]

Special Agent Dodsworth attaches to his declaration a copy of the subscriber information that Sprint produced in connection with the cellphone number that S1 had for Joe. The name of the listed subscriber is "Joe Stanis," located in Irvine, California. ECF 40 at 49. Also attached to Special Agent Dodsworth's declaration are arrest reports associating Shaw with Gloversville and Johnstown, New York.[4] In arrest reports dated April 19 and June 14, 2010, Shaw listed his address as "140 Bleecker, Gloversville, NY 12078." ECF 40 at 54, 56.

---

[3] Special Agent Dodsworth states that he was not present during an interview with S1 on October 2, 2014. Special Agent Dodsworth, however, spoke with agents who conducted the interview and reviewed the report of the interview before preparing the search warrant affidavit in question.

[4] Special Agent Dodsworth states that in his search warrant affidavit, he wrote that a review of Shaw's criminal history in New York revealed that Shaw had lived in both Johnstown and Gloversville, New York. That statement, however, was not as precisely stated as it should have been. Shaw's criminal history revealed that he had been charged with a crime in Johnstown, but the Johnstown address came from an Accurint printout, rather than from criminal history documents. Nonetheless, Shaw, in fact, was associated with an address in Johnstown, New York.

Special Agent Dodsworth also states that during S1's interview with the FBI, S1 said that Shaw lived with a "woman with kids." In the search warrant affidavit, Special Agent Dodsworth accurately reported what S1 said. Agents, however, did not see any children at Shaw's residence, but Special Agent Dodsworth is aware that Shaw has two children with his former girlfriend, Amanda Stumbrice. Further, Special Agent Dodsworth received information that at least one of the children spent some time living with Shaw at Shaw's residence in Portland.

Additionally, during Special Agent Dodsworth's investigation, he learned from another FBI agent about Ms. Gispert's email. That e-mail was sent to the FBI's Portland Tips email address and is dated January 16, 2014, several months before Sl's arrest and the ensuing investigation of Shaw. The e-mail reads, in its entirety:

> I heard from a third party that an Andre Shaw located at the address 1411 SE 179th Street Gresham Oregon is making military identification to be sold in order to use to obtain state ID's, and his main clients are some Russians and Iranian guys. The guy is a computer hacker that hacks into people[']s computers and steals their bank info. He goes by the name Joe here in Oregon and is from New York. Lives with some woman named Molly Taylor. Operates out of the location given in this email. I don't want to be contacted concerning this matter – I just wanted to get the info that I heard off my mind – if in fact it is true.

ECF 40 at 43.

On December 5, 2014, Special Agent Dodsworth interviewed Ms. Gispert by telephone. He learned that Ms. Gispert's third-party source was Amanda Stumbrice, Shaw's ex-girlfriend. Ms. Gispert told Special Agent Dodsworth about a number of statements that Ms. Stumbrice had made about Shaw, including that Shaw found sexual predators and would access their accounts to steal money from them. Ms. Gispert also said that Ms. Stumbrice told her that Shaw made fake military identification cards that could be used to obtain state identification cards.

PAGE 11 – OPINION AND ORDER

Ms. Gispert confirmed Shaw's address on SE 179th Avenue and said that he drives a silver car and a Ducati motorcycle.

Before submitting the search warrant affidavit, Special Agent Dodsworth requested a criminal history check on Ms. Gispert. He learned that she has several criminal convictions, including one for forgery. In his declaration, Special Agent Dodsworth states that his failure to include Ms. Gispert's criminal convictions in the search warrant affidavit was an oversight. He was not attempting to hide information from Judge Acosta or mislead Judge Acosta about the reliability of Ms. Gispert's information.

Special Agent Dodsworth further states that after speaking with Ms. Gispert, he spoke with Ms. Stumbrice, the third party from whom Ms. Gispert got her information. Ms. Stumbrice told Special Agent Dodsworth that she has two children with Shaw and that one of their sons spent part of a summer with Shaw in Portland. According to Ms. Stumbrice, Shaw would put Trojan computer viruses in images of child pornography and put the images on the internet. Shaw would gain access to people's computers after they downloaded the images containing the viruses. Shaw then could access people's stored photographs and bank account information and could even turn on their computer's web camera.

Although Ms. Stumbrice provided inculpatory information about Shaw, Special Agent Dodsworth deliberately decided not to name Ms. Stumbrice in the search warrant affidavit. She told Special Agent Dodsworth that she did not want to be named because she feared retaliation from members of Shaw's family. Because he chose not to name Ms. Stumbrice, Special Agent Dodsworth omitted from the search warrant affidavit the additional information that Ms. Stumbrice provided. Additionally, Special Agent Dodsworth did not include anything that Ms. Gispert told him that she learned from Ms. Stumbrice, other than what was in Ms. Gispert's

original e-mail to the FBI. A criminal history check revealed that Ms. Stumbrice has a conviction in 2012 for tampering with physical evidence. Because Special Agent Dodsworth did not name Ms. Stumbrice in the search warrant affidavit and did not include any information that she provided, he did not include her conviction in his affidavit.

**D.  Shaw's Offer of Proof and Evidence**

In Shaw's motions, he argues that Special Agent Dodsworth provided insufficient evidence to establish probable cause for the search of Shaw's residence. Shaw argues that Special Agent Dodsworth relies heavily on his training and experience to fill in gaps of information. For example, Special Agent Dodsworth states in his search warrant affidavit, "people who have a sexual interest in children . . . maintain their collections of child pornography in safe, secure, and private locations, such as their residence, and on computers and digital storage media under their direct control." ECF 32-1 ¶ 19. Shaw argues that such "boilerplate statements" about child pornography collectors cannot create the necessary link between Shaw's alleged crimes and his residence.

Shaw also asserts that he has discovered several potentially false statements and material omissions in Special Agent Dodworth's affidavit. First, Shaw argues that a private investigator was unable to locate any information indicating that Shaw or anyone named "Joe Stanis" used an address at 140 Bleecker Street, Gloversville, New York, or even an address at 143 Bleecker Street, Gloversville, New York. The private investigator, however, did find that Ms. Stumbrice and her brother appear to have used the 140 Bleecker Street address between 2010 and 2014.

Second, Shaw asserts that a private investigator was unable to find anyone with a first name of "Joe" or "Joseph" and a last name of "Stanis" associated with the cellphone number that S1 gave the FBI. According to Shaw's private investigator, the only person recently associated with that cellphone number is named "Brian Shoats."

PAGE 13 – OPINION AND ORDER

Third, Shaw asserts that he and Ms. Taylor do not live with children. If S1 in fact said that Shaw lives with children, this factual inaccuracy, Shaw argues, could undermine S1's credibility. Shaw also argues that S1 may be supplying information to the FBI to obtain a reduced sentence, dismissed charges, similar considerations, or some combination thereof. In other words, argues Shaw, S1 is providing this information out of self-interest.

Finally, Shaw argues that had Special Agent Dodsworth revealed the source of Ms. Gispert's information—Ms. Stumbrice, Shaw's ex-girlfriend—Ms. Gispert's credibility would have been undermined. Ms. Stumbrice, argues Shaw, is biased against him, and Ms. Gispert knew about that bias. Shaw offers Facebook instant messages sent by Ms. Gispert that state that Ms. Stumbrice is looking to "get even" with Shaw. ECF 32-2 at 20. Shaw argues that Ms. Gispert's credibility is further undermined by her own criminal convictions, which Special Agent Dodsworth neglected to mention in his affidavit. According to Shaw, these misstatements and omissions invalidate the search warrant for Shaw's home.

## DISCUSSION

### A.  Whether the Search Warrant Is Supported by Probable Cause

In reviewing the validity of a search warrant, the court is "limited to the information and circumstances contained within the four corners of the underlying affidavit." *United States v. Bertrand,* 926 F.2d 838, 841 (9th Cir. 1991) (quoting *Stanert*, 762 F.2d at 778). The probable cause determination "turn[s] on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. When making such a determination, courts are guided by "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

### 1.  Evidence that the Items Sought Would Be Found at Shaw's Residence

Shaw argues that the facts alleged in the search warrant affidavit are insufficient to support a finding of probable cause. He first argues that the search warrant affidavit does not provide probable cause to believe that the items sought will be discovered at Shaw's residence or on his computers. According to Shaw, there is no "reasonable nexus" between the crimes alleged, the items sought, and the locations to be searched. *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) (citing *United States v. Rodriguez*, 869 F.2d 479, 484 (9th Cir. 1989). Shaw argues that Special Agent Dodsworth primarily and unjustifiably relied on his training and experience concerning child pornographers to support his assertion that evidence of the alleged crimes would be found at Shaw's home and on Shaw's computers. Special Agent Dodsworth's training and experience, argues Shaw, do not establish a reasonable nexus.

As an initial matter, "when interpreting seemingly innocent conduct, the court issuing the warrant is entitled to rely on the training and experience of police officers." *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995). Although "a mere conclusory statement" by a law enforcement officer will not give rise to probable cause, *Gates*, 462 U.S. at 239, courts may consider the expert opinion of an experienced law enforcement officer concerning traits or conduct exhibited by a certain category of offenders, at least where facts in the affidavit place the defendant within that category. *See United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) ("But if the government presents expert opinion about the behavior of a particular class of persons, for the opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class.").

A "reasonable nexus" between the contraband sought and a suspect's residence exists if a magistrate judge could "find that it would be reasonable to seek the evidence there." *Chavez-Miranda*, 306 F.3d at 978. Such a finding does not require "[d]irect evidence that contraband or

evidence is at a particular location." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). Magistrate judges may look to "the nature of the evidence and the type of offense" and thereby "draw reasonable inferences about where evidence is likely to be kept." *United States v. Garza*, 980 F.2d 546, 551 (9th Cir.1992). For example, in cases involving alleged drug dealers, the Ninth Circuit has recognized that a law enforcement officer's knowledge of a defendant's possession of narcotics and experience with other drug dealers provides a magistrate with "a reasonable ground to believe" that contraband might be found in the defendant's residence. *United States v. Terry*, 911 F.2d 272, 276 (9th Cir. 1990) (quoting *United States v. Damitz*, 495 F.2d 50, 55 (9th Cir. 1974)).

Here, Special Agent Dodsworth sought a warrant to seize items relating to, among other things, the production, distribution, or possession of child pornography and computer-related fraud. The affidavit sought a search for these items at Shaw's residence at 1411 SE 179th Avenue, Portland, OR 97233. Special Agent Dodsworth presented much more than conclusory statements about his experience and expertise. The search warrant affidavit provided details about Shaw's possible role in an assortment of crimes and the link between those crimes and Shaw's home. According to S1, a mysterious person called "Redeemer" hacked S1's computer, learned about S1's child pornography activities, and instructed S1 to deliver blackmail payments to a man named "Joe." S1 described how "Joe" gave S1 fake identification cards. S1 also provided information about "Joe" taking S1's daughter for purposes of sexually abusing her and producing child pornography. S1's statements were corroborated by a chat log with Redeemer, text messages on the day the supposed illicit pictures of PD were taken, Sprint subscriber information for the cellphone number that "Joe" used, and Walgreens surveillance footage.

"Joe's" license plate number, provided to the FBI by S1, led to Shaw and the residence located at 1411 SE 179th Avenue.

Based on surveillance of 1411 SE 179th Avenue and Shaw's criminal records, the FBI established that Shaw matched S1's description of "Joe." Ms. Gispert's email confirmed that Shaw used the name "Joe" as an alias, and Shaw identified himself as "Joe Stanis" to Gresham police officers. Shaw's criminal records showed that he had once lived near New York addresses to which Redeemer instructed S1 to mail money, suggesting a close connection between Shaw and Redeemer. Ms. Gispert's email independently described how Shaw would create fake identification cards and hack into people's computers to steal financial information, indicating that Shaw could potentially be the computer hacker that S1 knew as "Redeemer." She stated that Shaw ran his operation out of his home. Finally, Gresham police officers observed a large amount of sophisticated computer equipment at Shaw's house.

To the extent that Special Agent Dodsworth relied on his experience and training in the search warrant affidavit, he provided information about where child pornographers usually store illicit images. According to Special Agent Dodsworth, "Child pornographers can upload images or video clips directly from a digital camera to a computer." ECF 32-1 ¶ 14. Additionally, in the affidavit, Special Agent Dodsworth stated, "As with most digital technology, communications made from a computer are often saved or stored on that computer." *Id.* ¶ 17. He further stated that child pornographers often keep their collections in their homes. As in *United States v. Hay*, 231 F.3d 630 (9th Cir. 2000), where the Ninth Circuit upheld a finding of probable cause, the affidavit "sets forth relevant background information about how child pornography is traded and distributed over the Internet." *Id.* at 636.

The alleged crimes required the use of technology such as cameras, sophisticated computer equipment, and printers. The Gresham police and Ms. Gispert provided evidence that such equipment would be found at Shaw's home. S1 provided information that Shaw was a child pornographer, and Special Agent Dodsworth provided an expert opinion about where child pornographers usually keep their collections: on computers in their homes. Based on the totality of these alleged facts and the nature of the offenses, the magistrate judge could reasonably have inferred that evidence of the production of child pornography, computer hacking, blackmailing, and manufacturing of fake identification cards would be found at Shaw's home. Therefore, there was probable cause that the items sought would be found at Shaw's residence.[5]

## 2. Reliability of Informants

Shaw also argues that the information provided by S1 and Ms. Gispert is not reliable and thus cannot give rise to probable cause for the search of Shaw's residence. Probable cause may be based on information provided by credible informants. To assess an informant's credibility, courts look to the "totality of the circumstances." *United States v. Roberts*, 747 F.2d 537, 543 (9th Cir. 1984). This test requires the issuing magistrate to assess "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' under the totality of the circumstances in determining the value of the informant's report in establishing probable cause." *Id.* (quoting *Gates*, 462 U.S. at 2327-28). If the reliability of a confidential source is in doubt, "the credibility of the statement is

---

[5] Shaw's motion focuses on whether there was probable cause that evidence of child pornography would be found at his residence. Even if probable cause to search for child pornography did not exist, the appropriate remedy would be suppression of evidence of child pornography, not suppression of all evidence obtained in the search. *See United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005) ("Partial suppression is proper under this circuit's doctrine of severance, which allows a court 'to strike from a warrant those portions that are invalid and preserve those portions that satisfy the fourth amendment.'" (quoting *United States v. Gomez–Soto*, 723 F.2d 649, 654 (9th Cir. 1984)). Here, no child pornography has been recovered. Therefore, under the doctrine of severance, lack of probable cause to search for child pornography would not require the suppression of any evidence thus far obtained in this case.

'enhanced' when the statement gives a detailed account of events that is corroborated by the statements of other confidential informants." *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004) (quoting *United States v. Hernandez–Escarsega*, 886 F.2d 1560, 1566 (9th Cir. 1989)).

### a.  Credibility of S1's Information

S1 provided first-hand information about Shaw's involvement in producing child pornography, providing fake identification cards, and blackmail. Many of S1's admissions were against penal interest, which bolsters his credibility. *See Angulo-Lopez*, 791 F.2d at 1397 (9th Cir. 1986) ("Veracity also may be established through admissions against penal interest."). There is no evidence that he received favorable treatment as a result of his admissions at the time Special Agent Dodsworth made his affidavit. S1 also provided a detailed description, independently verified by law enforcement, of the man later identified as "Shaw." S1's account of dropping his daughter off with Shaw for purposes of taking illicit photographs was corroborated by the chat log with Redeemer, text messages with Shaw, and Walgreens surveillance footage. S1's information was also corroborated by Ms. Gispert's email. The totality of the circumstances supports the credibility of S1's information.

### b.  Credibility of Ms. Gispert's Information

Special Agent Dodsworth noted in his affidavit that Ms. Gispert's information came from a third party. The fact that an informant reports hearsay "is no bar to a finding of probable cause" if "the circumstances suggest veracity." *Angulo-Lopez*, 791 F.2d at 1397. Although Shaw argues that no circumstances suggest that Ms. Gispert's source—Ms. Stumbrice—was reliable, the facts that Ms. Gispert reported aligned with S1's reports. Both Ms. Gispert and S1 stated that the man identified as Shaw, with an alias of "Joe," was involved in hacking computers and creating fake identification documents. Ms. Gispert stated that Shaw was directly involved, and S1 described

Shaw's indirect involvement through Redeemer. Both Ms. Gispert and S1 provided information that led to the address 1411 SE 179th Avenue. Both Ms. Gispert and S1 provided information that linked Shaw to Ms. Taylor. The similarity of the information provided by Ms. Gispert and S1 suggests that Ms. Gispert obtained accurate information from the third-party source. Thus, the totality of the circumstances of this case supports the credibility of Ms. Gispert's information.[6]

### 3.  Good Faith Exception

The Government argues that even if the Court concluded that there was not probable cause to support the warrant, the warrant fits within the good-faith exception set forth in *Leon*, 468 U.S. at 897. The Ninth Circuit has explained: "For the good faith reliance exception to apply, the officers must have relied on the search warrant in an objectively reasonable manner. The affidavit must establish at least a colorable argument for probable cause for the exception to apply." *United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (citations and quotation marks omitted). Indications of good faith include an extensive investigation and consultation with a government attorney before presenting the warrant to a magistrate judge. *See Leon*, 468 U.S. at 926; *United States v. Brown*, 951 F.2d 999, 1005 (9th Cir. 1991).

Reliance on a warrant is objectively unreasonable, and suppression remains an appropriate remedy, in four circumstances:

> (i) where an affiant misleads the issuing magistrate or judge by making a false statement or recklessly disregarding the truth in making a statement; (ii) where the magistrate or judge wholly abandons her judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral

---

[6] The Court separately addresses Ms. Gispert's criminal conviction, Special Agent Dodsworth's interview with Ms. Gispert, and the circumstances surrounding Ms. Stumbrice. The Court separately addresses these facts because they were not included in Special Agent Dodsworth's affidavit and therefore could not have provided the basis for a probable cause determination. These facts are relevant to Shaw's other arguments concerning material misstatements and omissions in the search warrant affidavit.

and detached official; (iii) where the warrant is facially deficient in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid; or (iv) where the affidavit upon which the warrant is based is so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith.

*Crews*, 502 F.3d at 1136.

Here, Special Agent Dodsworth undertook an extensive investigation into S1's allegations. The investigation included reviewing chat logs, text messages, Shaw's criminal history, and Walgreens surveillance footage. The FBI placed a pole camera outside Shaw's home, and Special Agent Dodsworth interviewed Ms. Gispert and Ms. Stumbrice about Shaw. As described above, there is at least a colorable argument that the affidavit established probable cause to search Shaw's home. Moreover, Special Agent Dodsworth and the Government represent that Special Agent Dodsworth reviewed his affidavit with an Assistant United States Attorney before submitting the affidavit to a Judge Acosta.

Shaw has not shown any circumstances that make the good faith reliance exception inapplicable to this case. As described below, there is no evidence that Special Agent Dodsworth misled Judge Acosta by making false statements or recklessly disregarding the truth. There is no evidence that Judge Acosta acted as only a "rubber stamp" or that the warrant is facially deficient in detail as to the place to be searched or the things to be found. Finally, the search warrant affidavit, with its many details and thorough descriptions of evidence, has sufficient indicia of probable cause that a reasonable officer could rely upon it in good faith. The circumstances of this case establish that Special Agent Dodsworth relied on the search warrant in an objectively reasonable manner. Therefore, even if probable cause was lacking, the good faith exception would apply.

PAGE 21 – OPINION AND ORDER

**B.  Whether Shaw Has Made a Substantial Showing of Intentional or Reckless Material Falsehoods or Omissions**

Shaw argues that the search warrant affidavit contains three false statements. He also argues that the affidavit omitted two material sets of facts.

**1.  Alleged False Statements**

**a.  Shaw's Former New York Addresses**

Shaw argues that Special Agent Dodsworth falsely stated that Shaw's criminal history shows that he lived in both Johnstown and Gloversville, New York. According to Shaw, his criminal history shows only Gloversville as a former address. In support of this argument, Shaw offers a summary from the Multnomah County District Attorney's Office showing that he was convicted of crimes in Gloversville, New York. ECF 33-1 at 1. Shaw also argues that a private investigator been unable to show any connection between Shaw and 140 Bleecker Street or 143 Bleecker Street in Gloversville, New York. The only possible connection is that Ms. Stumbrice appears to have lived at 140 Bleecker Street with her brother.

In Special Agent Dodsworth's declaration, he verifies that Shaw has a criminal conviction in Johnstown, New York, and attaches that record. *See* ECF 40 at 78-89. Additionally, although Special Agent Dodsworth admits that he may have been unclear in his affidavit about where he learned that Shaw had lived in Johnstown, he confirms that Shaw has had a Johnstown address. This information came from an Accurint printout, which Special Agent Dodsworth attaches to his declaration. *See id.* at 92. Moreover, in arrest reports dated April 19 and June 14, 2010, Shaw himself listed his address as "140 Bleecker, Gloversville, NY 12078." *Id.* at 54, 56-57. A computerized criminal history printout from New York State also lists that address, as does a "Master Name Report" obtained from the Gloversville Police Department. *Id.*

PAGE 22 – OPINION AND ORDER

at 64, 73. Special Agent Dodsworth's statements about Shaw's former New York addresses are not false and do not require for a *Franks* hearing.

Moreover, even if the statements about Shaw's former addresses were false, the statements are not material. *See Ippolito*, 774 F.2d at 1486 ("If it would have no effect, then the misstatement would not be material."). Shaw's former New York addresses only served to further associate Shaw with Redeemer and verify S1's information. Other information—such as the chat log and text messages between S1 and "Joe Stanis," *i.e.*, Shaw—provide a link between Redeemer and Shaw and corroborate S1's account of events.

### b.  Shaw's Cellphone Number

Shaw also argues that Special Agent Dodsworth falsely stated that the cellphone number that S1 gave the police is registered to someone named "Joe Stanis" in California. According to Shaw, his private investigator could find no records of that cellphone number being associated with "Joe Stanis." The investigator found only a listing for "Brian Shoats" from 2009 to September 2014.

In Special Agent Dodsworth's declaration, however, he states that he relied on information provided directly by Sprint in response to an administrative subpoena. According to Sprint, the subscriber to the cellphone number provided by S1 as of at least April 2011 is "Joe Stanis" in Irvine, California. Special Agent Dodsworth attaches to his declaration a printout of the information provided by Sprint. The printout shows "Joe Stanis" in Irvine, California as the subscriber. ECF 40 at 49. Agent Dodsworth correctly listed the subscriber information for the cellphone number in his affidavit. Furthermore, a motion for a *Franks* hearing is limited to challenging the veracity of the affiant, not the veracity of any nongovernmental informant. *See Franks*, 438 U.S. at 171. Here, Shaw challenges the veracity of a statement from Sprint, not

Special Agent Dodsworth. For these reasons, this alleged misstatement cannot serve as the basis

a *Franks* hearing.

### c.  Children in the Home

Additionally, Shaw argues that S1 incorrectly told Special Agent Dodsworth that "Joe"

lives with a woman with kids and that Special Agent Dodsworth mistakenly included this

information in his affidavit. Shaw asserts that he and Ms. Taylor, the woman with whom he

lives, do not have children together. According to Shaw, law enforcement should have observed

that no children lived at Shaw's home during the surveillance of 1411 SE 179th Avenue. Shaw

further argues that this misstatement "raises the stakes" of the search warrant affidavit because

Special Agent Dodsworth was alleging possession and creation of child pornography in a home

where children lived.  ECF 33 at 22.

As with Shaw's argument concerning the cellphone number supplied by S1, Shaw is not

challenging the accuracy of Special Agent Dodsworth's statements. Rather, Shaw is challenging

the accuracy of the information that Special Agent Dodsworth received from other sources.

Shaw's allegations violate "the rule that '[t]he deliberate falsity or reckless disregard whose

impeachment is permitted . . . is only that of the affiant, not of any nongovernment informant.'"

*United States v. Flockhart*, 990 F.2d 1262 (9th Cir. 1993) (alteration in original) (quoting

*Franks*, 438 U.S. at 171). Special Agent Dodsworth accurately reported S1's statements

regardless of the truth of those statements. Moreover, S1 may have been correct about children

living with Shaw, given the three years that S1 was involved with Shaw and Ms. Stumbrice's

statement that one of Shaw's children lived with Shaw in Portland for part of a summer. This

alleged misstatement does not trigger a *Franks* hearing.

2.  **Alleged Omissions**

   a.  **Details Concerning S1's Cooperation with the Government**

Shaw also argues that Special Agent Dodsworth's affidavit omits details of S1's
cooperation with the Government. S1 was arrested on child pornography charges, and the
affidavit states that the charges are still pending. S1 gave information about "Joe" in an interview
with the FBI roughly three months after his arrest. The affidavit does not describe how that
interview came about, and Shaw speculates that the Government must have offered S1 some sort
of benefit in return for S1's cooperation. Shaw argues that the omission of any facts about the
benefits S1 received improperly allowed the magistrate to infer that S1 had no motive to provide
false information. According to Shaw, when the omitted information is considered, S1's
reliability will likely be significantly reduced, thereby undermining the credibility of his
statements. Thus, argues Shaw, the omission of the terms of the Government's agreement with
S1 necessitates a *Franks* hearing.

Such speculative allegations do not amount to the substantial preliminary showing
required to trigger a *Franks* hearing. *Franks*, 438 U.S. at 171 (explaining that a defendant's
attack on a search warrant affidavit "must be more than conclusory and must be supported by
more than a mere desire to cross-examine"). Furthermore, the Government represents that "there
is no plea or cooperation agreement between S1 and the government." ECF 40 at 29 (emphasis
omitted). According to the Government, "[W]hile S1 may be hoping to receive some benefit
from his cooperation, no promises have been made. The government is not obligated to seek or
recommend any lenient treatment for S1, and remains free to charge him with any other provable
criminal conduct." *Id*. at 30. Special Agent Dodsworth confirms that his affidavit omitted any
mention of a cooperation agreement with S1 because no such agreement exists.

Additionally, nothing in Special Agent Dodsworth's affidavit prevented Judge Acosta from inferring that S1—who was described as having been arrested on child pornography charges— may have revealed information about Shaw in hopes of gaining favorable treatment. Such an inference would not have undermined the finding of probable cause, particularly given the other indicia of reliability described above. *See also United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004) ("That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct." (quoting *United States v. Harris*, 403 U.S. 573, 583-84 (1971)). Therefore, the purported omission of S1's agreement with the Government is not an intentional, reckless, or material omission that supports Shaw's request for a *Franks* hearing.

### b.  Information Surrounding the Statements of Ms. Gispert

Shaw also argues that Special Agent Dodsworth knowingly omitted several critical facts concerning the circumstances of Ms. Gispert's email. According to Shaw, these critical facts include the following:

- Ms. Gispert's third-party source of information is Shaw's ex-girlfriend, with whom Shaw has a tumultuous past.

- Ms. Gispert has admitted in Facebook instant messages that Ms. Stumbrice is seeking revenge on Shaw.

- Ms. Gispert has a criminal history, including convictions of forgery, robbery, burglary, and theft.

According to Shaw, Special Agent Dodsworth intentionally or recklessly omitted this information from his affidavit.  Shaw argues that this information undermines the probable cause finding.

### i.   Identity of Ms. Gispert's Source, Ms. Stumbrice

As explained above, Special Agent Dodsworth omitted any mention of Ms. Stumbrice from his affidavit because she said she feared retaliation from Shaw's family. Special Agent Dodsworth therefore did not include any of the inculpatory information he learned from Ms. Stumbrice or Ms. Gispert, other than what was in Ms. Gispert's original email to the FBI. Although Ms. Gispert learned the information that she reported in her email from Ms. Stumbrice, who could be biased by her former relationship with Shaw, that information was corroborated as described above. Therefore, the omission of Ms. Stumbrice's identity is not material to the probable cause determination.

### ii.   The Facebook Instant Messages

As for the messages that Ms. Gispert sent concerning Ms. Stumbrice, there is no evidence that Special Agent Dodsworth knew about the messages when he drafted his affidavit. The messages have no date and could have been sent after the search of Shaw's home was executed. In fact, it is most likely that the messages were sent after the search and Shaw's arrest because the messages discuss Shaw's arrest. ECF 32-2 at 7 ("I did not know any of that, until after he was arrested and it came out on the news[.]"). Therefore, the omission of any mention of these messages could not have been intentional or reckless.

Moreover, the messages describe only Ms. Stumbrice's possible bias. Any bias on the part of Ms. Stumbrice is not material because Special Agent Dodsworth received corroborating evidence that lent credence to the information that Ms. Stumbrice purportedly supplied. The messages also corroborate Ms. Stumbrice's statement that she feared retaliation, stating that Ms. Stumbrice reported being "in fear" after having a conversation with Shaw. *Id.* at 20. These messages are therefore not material to the probable cause determination, and their omission from the affidavit does not require a *Franks* hearing.

PAGE 27 – OPINION AND ORDER

### iii. Ms. Gispert's Criminal History

Finally, Special Agent Dodsworth admits that he knew about Ms. Gispert's criminal history. He asserts, however, that the omission of her criminal history from his affidavit was an inadvertent oversight rather than an intentional act. At most, the omission was negligent. Allegations of negligence are insufficient to trigger a *Franks* hearing. *Franks*, 438 U.S. at 171 ("Allegations of negligence or innocent mistake are insufficient."). Furthermore, the omission had no effect on the probable cause determination. Special Agent Dodsworth stated in his affidavit that Ms. Gispert learned the information from a third party, and the information corroborated what S1 had already reported. If Ms. Gispert's email had been the only reason to believe that evidence of a crime could be found in Shaw's home, then her criminal history, including conviction for a crime involving dishonesty, might have been material. But the email was not the only reason; it was one of several, including the observation by the Gresham Police that Shaw had sophisticated computer equipment in his home combined with S1's statements that he obtained fake identification documents from Shaw. Because Ms. Gispert's criminal history was not intentionally or recklessly omitted and was not material to the finding of probable cause, the omission does not require a *Franks* hearing.[7]

## CONCLUSION

Shaw's Motion to Suppress Evidence (ECF 32) and Motion to Suppress Evidence and Request for *Franks* Hearing (ECF 33) are DENIED.

---

[7] On August 4, 2016, the Court held a hearing on the pending motions. After receiving argument from counsel, the Court deferred ruling on Shaw's motion for a *Franks* hearing and allowed the presentation of evidence as if a *Franks* hearing had been ordered. Defendant called to the stand Special Agent Dodsworth and Ms. Gispert, who were sworn and examined. Based on the testimony and other evidence presented, the Court still would deny Shaw's motion to suppress evidence for the same reasons provided in this Opinion and Order, even if a *Franks* hearing had been ordered.

**IT IS SO ORDERED**.

DATED this 4th day of August, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge