BILLY J. WILLIAMS, OSB 901366
United States Attorney
District of Oregon
**GARY Y. SUSSMAN, OSB 873568**
Assistant United States Attorney
gary.sussman@usdoj.gov
**JULIA E. JARRETT**
Assistant United States Attorney
Julia.Jarrett@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204-2902
Telephone:  (503) 727-1000
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | No. 3: 15-cr-00227-SI |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **ANDRE EUGENE SHAW,** | |
| **Defendant.** | **Sentencing Date:  September 6, 2018** |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and Gary Y. Sussman, Assistant United States Attorney, submits the following sentencing memorandum for the Court's consideration in this case.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This investigation began with the July 2014 arrest of "JAD" for producing and distributing child pornography involving four young children, including his own

prepubescent daughter (PSR ¶¶ 27, 28).  During the course of two post-arrest interviews, JAD told investigators that he had been blackmailed by an individual known to him as "Blackhands" for the preceding three years (PSR ¶ 29).  Blackhands hacked into JAD's computer and discovered JAD's child pornography activities (*id.*).  Blackhands sent JAD an e-mail in which he demanded payment of $10,000 or JAD's life would be "over" (*id.*).[1]

JAD worked out an arrangement to pay Blackhands $1,000 per month, and sent him payments via Western Union money transfers (PSR ¶ 30).  Eventually, JAD began making payments directly to someone who he knew as "Joe" (PSR ¶¶ 30, 31).  Joe was later identified as defendant (PSR ¶ 30).

Over time, Blackhands made more demands of JAD.  He directed JAD to recruit people to skim credit cards at restaurants, to buy things for defendant (including firearms, ammunition, credit card skimming equipment, and a ballistic vest), and to pick up extortionate payments sent by other victims and give the money to defendant (PSR ¶¶ 31-33, 35-36).  Because JAD agreed to do so, his monthly extortion payment was reduced to $500 (PSR ¶ 35).

Defendant supplied JAD with false identification documents (including driver's licenses from various states and military identification cards) in fictitious names (*id.*).  JAD was told where and when to pick up wire transfers from other victims; he gave the

---

[1]  During a later text message exchange, Blackhands increased the extortion demand to $100,000.

**Government's Sentencing Memorandum**                                   **Page 2**

money to defendant (*id.*).  JAD recounted some of the false names he used, as well as the names of some of the victims whose payments he picked up and gave to defendant (*id.*).

About two years before JAD's arrest, Blackhands began demanding photos of JAD's daughter (PSR ¶ 37).  JAD was directed to give his daughter to Joe.  JAD understood that Joe or others would use his daughter to produce child pornography (*id.*).  JAD turned his daughter over to defendant two or three times (PSR ¶ 37).  JAD drugged her each time (PSR ¶ 39).

On the most recent occasion, JAD was directed to bring certain props, including costumes, make-up, and sex toys) and a digital camera when he dropped off his daughter (PSR ¶ 38).  He did so (*id.*).  When he picked his daughter up at the end of the day, defendant gave him back the box containing the props and the digital camera, minus the camera's memory card (*id.*).  The box of props was later recovered from JAD's garage.  Defendant's palm print was identified on the outside of the box (*id.*).

JAD provided investigators with a cellular telephone number he used to communicate with defendant.  The number came back to "Joe Stanis" at an address in Irvine, California (PSR ¶ 41).  Joe Stanis is an alias name used by defendant (*id.*).  A vehicle defendant drove when he picked up JAD's daughter was registered to Molly Taylor, who was then defendant's girlfriend, at an address in Southeast Portland (*id.*).

On December 18, 2014, defendant was arrested on an outstanding state misdemeanor warrant for failure to appear (PSR ¶ 66).  That same day, FBI agents and

**Government's Sentencing Memorandum**                                         **Page 3**

task force officers executed a federal search warrant at the residence he shared with

Molly Taylor (PSR ¶ 69).  They seized numerous items, including the following:

    a.    Eight counterfeit Oregon driver's licenses, all bearing the same photo of defendant, but having eight different names, eight different addresses, and five different license numbers.  None of the licenses were validly issued (PSR ¶ 69a).

    b.    A counterfeit Oregon driver's license in the name of John Murphy bearing the same photo of defendant, and a corresponding Social Security card. The driver's license number was invalid, although the Social Security number actually belonged to someone named John Murphy who lived in New York.  At one time, Murphy lived in the same New York town as defendant (PSR ¶ 69b)

    c.    A counterfeit New York driver's license in the name of Brent Moody, bearing the same photo of defendant.  This license was not validly issued (PSR ¶ 69c).

    d.    Envelopes containing holographic overlays for the Ohio Department of Public Safety, the Connecticut Department of Motor Vehicles, the Great Seal of the State of New Jersey, and the seal of the State of Pennsylvania (PSR ¶ 69d).  The holographic overlays were among the latest security features for each state's driver's licenses (*id.*).

    e.    A "Foreign Sovereign Immunities Act Non-Resident National ID" card bearing defendant's photo, the name "Joseph-Michael Stanis," and the seal of the U.S. Department of State (PSR ¶ 69e).

    f.    Supplies and equipment for manufacturing high-quality false identification documents, including blank credit card stock (some with magnetic encoding stripes, and some with embedded computer chips), additional holographic overlays, acrylic paint, brushes, a laminator, a magnetic stripe reader/encoder, a cutter, and a stamp maker (PSR ¶¶ 69f-69h).

    g.    Three books on creating a new identity (PSR ¶ 69i).

    h.    Compact discs labeled "ORDMV," "Social Security Administration," "OHDMV," "FISA," "U.S. Department of Defense," "NJDMV," "RIDMV," and "NYDMV."  The discs could not be opened, so their actual contents are unknown (PSR ¶ 70).

**Government's Sentencing Memorandum**                         **Page 4**

i.    Numerous firearms, magazines, ammunition, and homemade silencers. Included among the firearms were a Bushmaster .223 caliber assault-style rifle with a barrel under 16 inches long (along with 27 spare .223 caliber magazines, 20 of which were loaded), and homemade firearm silencers (PSR ¶¶ 72, 73). Neither the Bushmaster rifle nor the silencers were registered to defendant in the National Firearms Registration and Transfer Record (PSR ¶ 74).

j.    Numerous compact discs with a printed image of a black silhouetted figure with a prominently extended black hand, each labeled with a set of initials and an alpha-numeric code. The initials matched those of people later identified as victims of defendant's extortion scheme, including JAD, "KAS," and others, at least two of whom took their own lives after being contacted by law enforcement authorities (PSR ¶¶ 43, 49, 55, 71). All of the victims who were interviewed reported being extorted by someone using some variant of the name "Blackhands."

k.    Cash and precious metals, including silver coins and bars, gold coins, and $13,344 in U.S. currency.

Investigators found numerous Western Union money transfers that were sent to the alias names supplied to JAD, and the alias names on the false driver's licenses found during the search of defendant's residence. A number of the senders were interviewed, and admitted having been extorted (PSR ¶¶ 42-59). One of those victims was KAS, who lived in California (PSR ¶ 42).

KAS told investigators that sometime in or around January 2014, he received an email with an attachment that contained screenshots of his computer, including work and personal e-mails, social media profiles and contacts, banking information, and personal identifying information (PSR ¶ 43). The e-mail informed KAS that he had seven days to pay $500 or the sender would ruin his life (PSR ¶ 45). He could not remember the

**Government's Sentencing Memorandum**                                                                              **Page 5**

sender's e-mail address, although he recalled that the e-mail was sent through "Hushmail" or another anonymous e-mail service (PSR ¶ 44).

KAS paid the $500 via a Western Union money transfer (PSR ¶ 45). Thereafter, he was given the option of making a lump-sum payment of $20,000 or continuing to pay $500 per month indefinitely (*id.*). KAS chose to make a lump sum payment. He took out a personal loan, and (as instructed) flew to Portland to deliver the payment in person (*id.*). He took the money to a pre-determined Starbucks coffee shop, where JAD picked it up and delivered it to defendant (PSR ¶ 46). KAS returned to California. He received an e-mail stating, "It is done," and "godspeed." He had no further contact from the blackmailer, who, KAS believed, used the name "Whitehand" (*id.*).

In all, defendant extorted well over $100,000 from various victims. The full extent of his criminal activities remains a mystery, however, because his computer equipment and the various discs found in his residence are all heavily encrypted. To date, the government's attempts to defeat the encryption have been unsuccessful.

On May 9, 2018, defendant waived indictment and pled guilty to a superseding information charging him as follows:

1.   Extortion with respect to JAD, in violation of 18 U.S.C. § 1951;

2.   Transmitting extortionate communications in interstate commerce with respect to JAD, in violation of 18 U.S.C. § 875(d);

3.   Transmitting extortionate communications in interstate commerce with respect to KAS, in violation of 18 U.S.C. § 875(d);

4.   Money laundering with respect to the offense against KAS, in violation of 18 U.S.C. § 1956(a)(1)(B); and

> 5.    Possession of an unregistered short barreled rifle, in violation of 26 U.S.C.
>       § 5861(d).

The superseding information also contained three forfeiture allegations.  Following the

change of plea hearing, the Court entered a preliminary order of forfeiture and final order

of forfeiture as to defendant, in which defendant agreed to the entry of an in personam

money judgment in the amount of $105,000, much of which will be satisfied by the assets

seized from defendant's residence during the execution of the search warrant (ECF 78).

The U.S. Probation Office prepared a presentence report.  The report grouped the

five counts of conviction into three groups.  Counts one and two were one group, counts

three and four were a second group, and count five was its own separate group (PSR

¶¶ 88, 95, 102-107).

With respect to counts 1 and 2, the report calculated a base offense level of 18,

then added two levels because the loss (or amount demanded) was between $95,000 and

$500,000, resulting in an adjusted offense level of 20 (PSR ¶¶ 89, 90, 94).  As to counts 3

and 4, the report calculated a base offense level of 13, then added two levels because

defendant was convicted under 18 U.S.C. § 1956, resulting in an adjusted offense level of

15 (PSR ¶¶ 96, 97, 101).  With respect to count five, the report calculated a base offense

level of 18, then added two levels because defendant unlawfully possessed between three

and seven firearms, resulting in an adjusted offense level of 20 (PSR ¶¶ 102, 103, 107).

After applying a multiple count adjustment and recommending a three-level reduction for

acceptance of responsibility, the report calculated a total offense level of 20, a criminal

history category of I, and an advisory sentencing range of 33-41 months (PSR ¶¶ 108,

**Government's Sentencing Memorandum**                                            **Page 7**

111, 113-15, 122, 152).  The Probation Office recommends a total sentence of 41 months, followed by a three-year term of supervised release (PSR Sent. Recommendation at 1).[2] The government concurs in that recommendation.

## II.     DISCUSSION

### A.     *The Plea Agreement in This Case.*

The agreement contains guideline calculations that mirror those in the presentence report (Plea Agreement, ¶ 7).  Provided defendant demonstrates a full acceptance of responsibility, the government will recommend a sentence at high end of the applicable guideline range, but will not seek an upward departure or variance (*id.*, ¶ 9).  Defendant may seek a downward departure, adjustment, or variance, which the government will oppose (*id.*, ¶ 10A).  Defendant agrees to forfeit $105,000, which represents proceeds he personally obtained, either directly or indirectly, as a result of his criminal activity (*id.*, ¶ 17A).  He also agreed to forfeit the Bushmaster rifle (*id.*).  The government agreed to return certain property to defendant at the conclusion of this case (*id.*).

The agreement is governed by Fed. R. Crim. P. 11(c)(1)(B).  Thus, the Court is not bound to adopt or accept the recommendations of the parties or the U.S. Probation Office (Plea Agreement, ¶ 12).  The agreement contains a standard waiver of appeal and collateral attack (*id.*, ¶ 11).

---

[2]  Because the statutory maximum penalty for counts 2 and 3 is two years' imprisonment, the Probation Office recommends sentences of 41 months' imprisonment on counts 1, 4, and 5, and concurrent sentences of 24 months on counts 2 and 3 (PSR Sent. Recommendation at 1).

**B.      *The Appropriate Sentence in This Case.***

The guideline calculations in the presentence report are correct.  Defendant's total offense level is 20, his criminal history category is I, and his advisory sentencing range is 33-41 months.

The guidelines, of course, are now advisory.  *United States v. Booker*, 543 U.S. 220 (2005).  Nonetheless, they still serve as the starting point and initial benchmark in all sentencing proceedings.  *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013); *Gall v. United States*, 552 U.S. 38, 49 (2007).  They are one of the statutory factors that sentencing courts must consider when imposing a sentence, *see* 18 U.S.C. §3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-48 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Rita*, 551 U.S. at 350.  Thus, when a sentencing judge's "discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable."  *Id.* at 351.

The guidelines, while advisory, "provide the framework for the tens of thousands of federal sentencing proceedings that occur each year."  *Molina-Martinez v. United States*, 136 S.Ct. 1338, 1342 (2016).  The guidelines were designed to achieve uniformity in sentencing among different courts for similar criminal conduct, as well as promoting proportionality in sentencing through a system that imposes "appropriately different sentences for criminal conduct of different severity."  *Id.* (internal quotation marks and citation omitted).

Sentencing decisions remain "anchored" by the guidelines.  *Peugh*, 133 S. Ct. at 2083.  The guidelines remain "the lodestone of sentencing," and "cabin the exercise" of a

sentencing court's discretion. *Id.* at 2084. The guidelines "inform and instruct the district court's determination of an appropriate sentence." *Molina-Martinez*, 136 S.Ct. at 1346. The Court must also consider the sentencing factors listed in 18 U.S.C. § 3553(a), including the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. 18 U.S.C. §§ 3553(a)(1)-(2). Other factors include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and, where applicable, the need to provide restitution to any victims of the offense. 18 U.S.C. §3553(a)(7). *See also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 50, n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting en banc, summarized the procedures a sentencing court must follow. The Court must first correctly determine the applicable guideline range. *Id.* at 991. The Court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the § 3553(a) factors to decide if they support the sentence suggested by the parties." *Id.* The Court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other factor. *Id.* The Court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id.* at 991-92.

In light of all of the facts and circumstances present in this case, including the extent and egregious nature of defendant's criminal conduct, a sentence at the high end of

the advisory sentencing range – which is only 41 months – is fully warranted and eminently reasonable.  Indeed, anything less would fail to account for many of the relevant § 3553(a) factors.

Defendant was involved in extorting numerous victims, most of whom were producing, trading in, or collecting child pornography.  While the government cannot definitively say that defendant was "Blackhands," the discs found in his residence, which included the initials of many of the extortion victims and a prominently displayed black hand, certainly suggest he is.  And the true extent of his criminal activity may never be known, since his computer equipment and data storage media, including the discs with the victims' initials on them, all remain encrypted.

Defendant received well over $100,000 in extortion proceeds, either directly, or through JAD.  At least two of his victims are now dead, having taken their own lives after they were contacted by law enforcement officers.  And at least one little girl – JAD's daughter – was victimized by defendant or someone defendant knew.  Insisting that JAD turn his daughter over to be abused or exploited speaks volumes to the depth of defendant's depravity.[3]

Defendant's criminal activities did not end with extortion and the sexual exploitation of a child.  He amassed a collection of firearms, legal and illegal, at least

---

[3]  The government cannot say definitively that it was defendant who personally demanded that JAD turn over his daughter.  But JAD gave her *to defendant*, and defendant's palm print was found on the box of props, which included costumes, sex toys, and a digital camera.

**Government's Sentencing Memorandum**                                          **Page 11**

some of which were purchased for him by one of his victims. His collection included handguns, a short-barreled .223 assault rifle with 27 spare magazines, and several homemade firearm silencers. He also had a police badge, a DEA raid jacket, and a ballistic vest.

Defendant was highly skilled in making convincing false identification documents. He produced false driver's licenses from various states that included the latest holographic security features, military identification cards, and documents purportedly issued by the U.S. Department of State. He had equipment and materials for forging documents and producing fraudulent credit cards. He had books on how to create a new identity. And he amassed substantial assets in the form of cash, vehicles, and precious metals, none of which were ever reported on an income tax return.

Although he is in criminal history category I under the guidelines, defendant has not led a crime-free life. He has four juvenile adjudications (including two sexual offenses) which received no criminal history points (PSR ¶¶ 117-120). He has a conviction in Multnomah County for failing to carry and present a driver's license, which also received no criminal history points (PSR ¶ 121). He has several cases pending in New York State, for which non-extraditable warrants remain outstanding (PSR ¶¶ 125-27).

A high-end sentence of 41 months is sufficient but no greater than necessary to address many of the § 3553(a) sentencing factors. It addresses the nature and seriousness of defendant's criminal conduct – at least that which is presently known – which is

**Government's Sentencing Memorandum**                                    **Page 12**

serious indeed.  It also addresses defendant's background, history, and characteristics.  It provides just punishment, acts as an adequate deterrent, promotes respect for the law, and protects the public from further crimes defendant would otherwise commit.  It is the sentence the Court should impose.[4]

### C.   Restitution.

To date, the government has received no requests for restitution from any of defendant's victims.

### D.   Forfeiture.

As part of his plea agreement with the government, defendant agreed to the entry of an in personam money judgment in the amount of $105,000, which may be satisfied through the seizure of substitute assets.  A preliminary order of forfeiture and final order of forfeiture as to defendant has already been entered (ECF No. 78).  The government will be asking the Court to enter a final order of forfeiture at the sentencing hearing.

## III.   CONCLUSION AND SENTENCING RECOMMENDATION

The guideline calculations in the presentence report are correct.  Defendant's total offense level is 20, his criminal history category is I, and his advisory guideline range is 33-41 months.  For the reasons set forth above, the government urges the Court to impose

---

[4]  At this point, even a high-end sentence of 41 months will not protect the public for long, since defendant has been in custody continually, either federally or in Multnomah County, since his arrest on December 18, 2014.  He will likely receive credit against his sentence for the time he spent in state custody, because those charges were ultimately dismissed in favor of this federal prosecution.  Thus, even if the Court imposes a 41-month sentence, defendant will not have much longer to serve.

a total sentence of 41 months' imprisonment (41 months on counts 1, 4, and 5, and 24 months on counts 2 and 3, all imposed to run concurrently with each other), followed by a three-year term of supervised release.  The government concurs with the standard and special conditions of supervision recommended in the presentence report.

Dated:  August 29, 2018.                                  Respectfully submitted,

                                                          BILLY J. WILLIAMS
                                                          United States Attorney

                                                           */s/ Gary Y. Sussman*
                                                          GARY Y. SUSSMAN, OSB 873568
                                                          Assistant United States Attorney